UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 19-CR-10368-WGY |
| | ) | |
| KERRY CHARLOTIN | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

*A review of Mr. Charlotin's psychiatric and criminal histories suggests that he has been repeatedly viewed as a dangerous man in need of restraint/detention rather than a mentally-ill man in need of treatment. It is difficult not to suspect that his skin color and relative poverty informed the perceptions that led to him being imprisoned rather than hospitalized.[1] Dr. Julia Reade*

The guideline range found by the Probation Department of 77-96 months is driven not by the specific characteristics of this offense – a gun found in a backpack – but rather by Mr. Charlotin's criminal record. Given Dr. Reade's findings, we ask the Court to scrutinize this guideline range and impose instead a sentence of 48 months, with 3 years of supervised release to follow.

This sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing.  United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005); United States v. Martin, 520 F.3d 87 (1st Cir. 2008); United States v. Rodriguez, 527 F.3d 221 (1st Cir. 2008). This sentence will also better reflect both the serious

---

1 Psychiatric Report, Dr. Julia Reade, Exhibit 1, pg. 17.

nature of illegal gun possession but consider the extenuating circumstances that led to much of Mr. Charlotin's criminal history.

> I. **Guideline Range**

The guideline range found by the Probation Department, 77-96 months, includes scoring several convictions, which appear at closer inspection, to have arisen from Mr. Charlotin was experiencing symptoms of his well-documented mental illness. We ask the Court to consider a departure or variance from the Criminal History Category of VI, down to Category IV, in light of the connectivity between his untreated Bipolar Disorder, his behavior, and the failure of the community to better support him. *See* United States v. Martin, 520 F.3d 87 (1st Circuit, 2008) In Martin, "[t]he court adopted the guidelines calculations limned in the PSI Report with one exception: having found that the defendant's criminal history score overstated the seriousness of his felonious past, the court rolled back his criminal history category from VI to V." This decision was affirmed by the 1st Circuit and discussed Judge Ponsor's reasoning: that this was an appropriate step because of the "…defendant's close family ties and support; the defendant's personal qualities, and to be in line with the sentences being imposed on codefendants in this matter." Id. While Mr. Charlotin's circumstances are unique, we believe that his mental health history provides the Court with a similar opportunity to apply a lower criminal history score.

What we ask the Court to consider in this case, as will be discussed in detail in the section concerning Mr. Charlotin's mental health, is to place Mr. Charlotin into Criminal History Category IV, with a guideline range of 57-71 months.

> II. **History and Characteristics of the Defendant & Nature of the Offense – Application of § 3553(a)(1)**

*a. History and Characteristics of the Defendant*

Mr. Charlotin was primarily raised by his father and step-mother, having been removed from his mother's care by the Department of Social Services when he was very young. Mr. Charlotin's mother beat him regularly with household implements such as extension cords and brushes. He recalls the physically abuse vividly and describes that his childhood home would vary wildly between calm and chaotic. His mother speaks little English, and he was raised speaking Haitian Creole. There would be days that were fine and days that felt like there was constant arguing and violence. Kerry has no memory of his mother ever having a job; rather she was paid by local community members who would come to her for voodoo practices. Then one day a social worker from the Department of Social Services (now Department of Children and Families) came, picked him up at school and he never returned to her care. Even though his household was often violent, as a young child who did not fully comprehend that this violence was not normal, Mr. Charlotin was traumatized by the removal, missed his mother terribly, and has certainly been harmed by the abrupt end of their relationship.

After being taken by DSS and held in multiple foster homes, he was eventually placed with his father. He was in foster care for approximately one to two *years* before his father was able to take him in. His father's absence during his time in foster care is inexplicable, as he lived in the Greater Boston area. While in foster care, Mr. Charlotin was further traumatized by the separation from his siblings. Inside the foster homes, there was a lot of fighting between him and the other children. Mr. Charlotin had a hard time understanding the expectations of the foster homes because he was raised speaking Creole. Eventually he and his sister grew apart after this separation and he would only see her in passing on the street.

His mother was eventually prosecuted for various abuse-related charges in the Middlesex Superior Court and sentenced to a state prison term.[2] The details of the charges against her were not immediately available on the public docket, but she was evaluated for competency and the Commonwealth sought to introduce evidence of her voodoo practice. We believe this conviction led to her eventual deportation.

After moving in with his father, he was embraced by his step-mother Jessica Senat. While his father would still hit him with a belt as discipline, his step-mother would intervene and encourage the use of words instead of violence. Even when not physically abusive, his father was a "rough guy" who was often harsh and cold towards him. Throughout this time he often wondered why his father had left him in foster care for so long. Mr. Charlotin moved out at age 16 and describes that he just "roamed the streets." After leaving his father's home, he effectively never had a stable home again.

Mr. Charlotin is now himself a father. He has three sons, who live in the greater Boston area. Jhaikhai, is 11, and lives with his mother in Brookline. Since he has been incarcerated, Jhaikhai's mother will not permit him to have contact. Khyreeamari is 6 and lives with his mother in Lynn. Even before his arrest, he rarely saw Khyreeamari because of the distance and challenges in his relationship with the child's mother. Khyel is also 6 and lives with his mother in Boston. He saw Khyel regularly before his arrest and participated in his upbringing. Since this pre-trial detention he has been able to speak with him regularly, but has not been able to visit because his mother was missing his birth certificate. This forced separation between Mr. Charlotin and his children has been very hard for him. He worries that his children will have so

---

[2] Docket 9981 CR 0090 – Middlesex Superior Court, Commonwealth v. Marie Calixte

many life experiences without him and that their bond will be weakened the longer he is away from them.

      *b. Mental health*

Mr. Charlotin has been diagnosed with Bipolar Disorder. He has been hospitalized on many occasions following significant psychiatric episodes that include him behaving erratically and threatening people, including acting out at his high school.

One particular incident can shed light on the severe mental health symptoms that Mr. Charlotin was carrying even before he was a teenager. At the age of 12, he acquired a loaded firearm from a gang member who lived near his father's home. He took the gun, put it to his head and pulled the trigger. The only reason he is not dead is because he did not know how to properly operate the gun and it did not fire.

Mr. Charlotin describes his psychiatric commitment at the age of 17 by sharing that he basically "woke up" at Westborough state hospital. He went from Westborough to Arbor Counseling and eventually returned home to his father's house. Kerry has had two seizures due to his parent's improper dosing of Depakote, which was prescribed to him after that Westborough hospitalization in 2010. He suffered stress headaches so significantly that he was hospitalized several times in his late 20s. He was committed to Tufts Hospital for several months following an episode where he overheated and could not take his clothes off fast enough and showered with all of his clothes on.

At the age of 17, Mr. Charlotin had several interactions with the police that could have served as a red flag, described at ¶¶ 30, 31, & 32 in the PSR. In April of 2007, during court proceedings related to ¶ 31, Mr. Charlotin was taken to Bridgewater State Hospital for a

competency evaluation. Despite his young age, he was processed in to this adult psychiatric prison. Dr. Reade aptly describes how unusual and inappropriate this treatment was:

It is shocking to me that Mr. Charlotin was sent to Bridgewater as a 17-year old minor and only transferred to the appropriate setting—the adolescent unit of a civilian psychiatric hospital—after spending two weeks locked up in a secure prison setting with violent, mentally-ill adult inmates. In my experience, Bridgewater is frightening to many of the adult defendants transferred there, as well as to the civilian visitors accustomed to visiting secure psychiatric or correctional facilities. Mr. Charlotin had never been incarcerated before this. He was acutely psychotic at the time with a major mental illness, and required months of specialized treatment in the hospital to stabilize him on medication. It is likely, in my view, that the initial commitment to a jail and then to Bridgewater adversely affected his clinical course.

Report of Dr. Reade, pg. 17.

The reality is that he was a teenage boy who needed help. His step-mother, Jessica Senat, looks back on this time and acknowledges that they should have stepped in and sought more aggressive treatment.

Mr. Charlotin was again exhibiting significant symptoms of bipolar disorder during the interactions with the police that result in ¶¶ 34, 35, 36, & 37 in the PSR. These four cases demonstrate a further decompensation of his mental health. He has interactions with the police in July of 2009 (¶34); September of 2009 (¶35); January of 2010 (¶36) and February of 2010 (¶37). Finally after this fourth arrest in 7 months, which included incidents of him making irrational statements at his High School and in February of 2010 where he was making irrational threats to a cab driver, he was held without bail. He was evaluated again during this period of pre-trial detention, this time at Taunton State Hospital. Dr. Reade observes that those treating physicians found him to be "irritable, threatening and hypersexual. He acknowledged daily marijuana use and episodic cocaine use. The treating physician questioned whether he had a mental illness or a personality disorder."[3] The PSR indicates that during this 2010 hospitalization Mr. Charlotin was "prescribed Depakote and was found unresponsive, lying on the floor face down." PSR ¶ 83.

---

3 Dr. Reade Report, pg 9.

This coincides with periods of homelessness that Mr. Charlotin experienced, having left his father's abusive household. PSR ¶ 71.

Collectively, these charges from ¶¶ 34-37 account for 6 of his 13 criminal history points. If these incidents had been handled radically different – with the focus on the rapidly declining mental health of a teenager and young adult, as Dr. Reade proposes we do – and those incidents be treatment centered, rather than punitive, Mr. Charlotin could have 7 criminal history points and fall in CHC IV. Dr. Reade's concern that Mr. Charlotin was processed *in* to the criminal court system, rather than processed *out* and diverted into a treatment setting is likely due to a combination of lack of suitable parental support and the systemic racism that is rooted in all aspects of American culture – including our courts. "So deeply embedded are notions equating Blackness with criminality that, in addition to being punished more severely than White people, Black people with darker skin and "African" features are punished more severely than those with lighter skin and "European" features."[4] For Mr. Charlotin, this disparity did not look like any one particularly long period of incarceration, as we will discuss next, but rather the cumulative effect of treating each instance of erratic behavior with a police response rather than a mental health response.

A defendant with an offense level of 21 who falls into Criminal History Category IV would have an advisory guideline range of 57-71 months. A sentence within that guideline range is certainly a severe punishment for an individual like Mr. Charlotin who has ever, at most, been sentenced to approximately 5 months of incarceration at any one time. PSR ¶ 38. (While this

---

4 http://cjpp.law.harvard.edu/assets/Massachusetts-Racial-Disparity-Report-FINAL.pdf, pg. 68, citing Michael Tonry, The Social, Psychological, and Political Causes of Racial Disparities in the American Criminal Justice System, 39 CRIME & JUST., 273, 283 (2010) ("Research on the influence of skin tone and 'Afrocentric' features shows that negative stereotypes are deeply embedded in American culture and operate to the detriment of [B]lacks in the criminal justice system. They cause [Black people in the criminal system] to be punished more severely than [W]hites, and among [B]lacks they cause dark-skinned people, and people with distinctively 'African' facial features, to be punished more severely than light-skinned people and people with more 'European' features.").

charge was brought in the Suffolk Superior Court, the 5 months imposed as part of a split sentence was "deemed served" which indicates that Mr. Charlotin was never required to serve any prison time in the Department of Corrections). The fact that many of Mr. Charlotin's relatively brief periods of incarceration were largely served pre-trial (PSR ¶ 37 – 60 months to serve, 100 days of credit; ¶¶ 40 & 41 – 114 days to serve, deemed served) also shows that Mr. Charlotin has not had the benefit of any long periods of access to the rehabilitative services that the prisons may have afforded him. What he has demonstrated now is that when given that opportunity, he can excel.

The sentence that we propose – of 48 months – is a 9 month variance from the 57-71 month guideline range which we find appropriate given the totality of Mr. Charlotin's personal circumstances when viewed in the context of this charge.

      c. *Nature of the Offense*

There is no doubt that this is a serious crime. Mr. Charlotin was in possession of firearm, found inside a backpack he had carried with him on May 1, 2019. There is no allegation that he ever brandished that firearm or used it in the commission of any crime. The interaction with the police that day occurred simply because Mr. Charlotin was in a heavily policed section of the City of Boston's Mattapan neighborhood and he reacted to their questioning of him, not because a person saw him with a firearm. Mr. Charlotin appreciates the seriousness of the case and the affect that illegal firearms have on his community.

### III.    Achievements During Incarceration – Application of § 3553(a)(2)

Mr. Charlotin has viewed this period of pre-trial detention as an opportunity to reevaluate his life choices and hopes to change his trajectory. Mr. Charlotin has participated in and taken advantage of almost all the programming and work opportunities available to him. He has taken

courses that will simply make him a more well-read, engaged and knowledgeable person (writing workshops and American History, for example) as well as courses that will allow him to better manage his behavior and relationships (workshops on trust, decision making, boundaries, self-esteem, self-awareness, goal planning, anger management, impulse control, forgiveness, etc.).[5] This is not the behavior of a person who has given up on themselves and is resigned to a negative lifestyle. This is the behavior of a person who, despite being in very challenging circumstances, makes the most of what they have in front of them.

Mr. Charlotin is perhaps most proud of the work he has done as a barber. He told Dr. Reade : "I wanted to be productive. I didn't want to sit still and collect dust."[6] He took the coursework for his licensure within the state of Rhode Island and has been employed at Wyatt throughout his pre-trial detention.[7]

None of these achievements would have been possible during this time if he also did not maintain a good relationship with staff.[8]

### **Conclusion**

For these reasons, we ask the Court to impose a sentence of 48 months, with 3 years of supervised release to follow.

---

5 Attached are the Certificates from many of those programs.
6 Report of Dr. Reade, page 13.
7 Attached is Mr. Charlotin's Barber License in the State of Rhode Island.
8 Wyatt Disciplinary Letter

                KERRY CHARLOTIN
                By his attorney

                */s/ Jessica P. Thrall*
                Jessica P. Thrall
                #670412
                Federal Defender Office
                51 Sleeper Street, 5th Floor
                Boston, MA 02210
                617-223-8061

## CERTIFICATE OF SERVICE

     I, Jessica P. Thrall, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 9, 2020.

                */s/ Jessica P. Thrall*
                Jessica P. Thrall