# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:19-cr-10368-WGY |
| ) | |
| KERRY CHARLOTIN, ) | |
| Defendant. ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Over the course of the past decade, Kerry Charlotin has engaged in a course of dangerous behavior, culminating in his conviction for being a felon in possession of a firearm and ammunition. Contrary to the defense expert's assertion, Charlotin's mental health problems have been recognized and treated, as demonstrated by the fact that he has been sent for treatment rather than prison in response to the erratic behavior episodes described in the PSR, and never served more than five months in prison for his more serious conduct. However, treatment of his mental health problems requires his participation in the treatment. His record and the Presentence Report ("PSR") demonstrate that he has on numerous occasions failed to take his medication as prescribed and/or self-medicated with alcohol and illegal drugs. Although mental health problems have no doubt played a role in the defendant's criminal history, his own choices have as well, and those choices and actions have terrorized members of the community. He has threatened to shoot up a cab ("If I am going to jail, I'll make it worth it"), PSR ¶ 37; participated in a violent larceny from a person, stealing a backpack from an individual after another man punched him in the face and stomped on his shoulder, PSR ¶ 38; stolen money from a man, sticking his hand in his pocket and claiming he had a gun, PSR ¶ 40. In the instant case, he made the choice to illegally carry a loaded firearm in the city of Boston – even as he knew he had

mental health and substance abuse issues – and in doing so, he put the community at great danger.  Accordingly, the Government now must recommend a 77-month sentence of imprisonment – the low end of the Guidelines Sentencing Range ("GSR") as calculated by the United States Probation Office ("Probation") – as well as supervised release for three years thereafter.

## FACTS

On May 1, 2019, around 5:23PM, members of the Boston Police Department made an onsite arrest of Charlotin for firearm charges. They had observed the defendant walking on Blue Hill Avenue towards Morton Street near a liquor store with an acquaintance, Jabrill Andrews ("Andrews"). Officers noted both Charlotin's and Andrews's calm demeanor as they appeared to be walking towards a nearby liquor store. When both appeared to observe the officers' presence in their unmarked cruiser, both Charlotin and Andrews hurried their pace, walked past the liquor store and turned right onto Landor Road, constantly looking back in a nervous manner. Officers saw the two enter the rear private driveway that allows access for business owners along Blue Hill Avenue between Morton and Landor and were aware that there are numerous "No Trespassing" signs barring unauthorized entry. Throughout this period, Andrews, wearing a black jacket, appeared to be walking in front of Charlotin, who was wearing a red jacket and a black backpack on his back.

Both the defendant and Andrews walked into a smaller secluded driveway and parking lot. The back entrances of the Blue Hill avenue commercial establishments (that is, businesses between Landor and Morton Street) line this driveway. As officers pulled into the driveway, both Charlotin and Andrews were running away from them, with Charlotin (clad with his black backpack) running considerably behind Andrews. Officers got out of their unmarked cruiser to

run after the two men. Andrews was out of sight at this point. An officer saw the defendant at the back door of one of the Blue Hill Ave businesses. The defendant was in his red jacket and a black backpack was in the air, headed in the direction of the roof.  The defendant then entered the rear of the commercial building (which turned out to be a barber shop), ran through the barber shop to the front entrance on Blue Hill Ave, and continued to run on Blue Hill Ave towards Morton Street and take a right onto Morton Street where officers lost sight of him.

Officers eventually located Charlotin laying down in brush behind a fenced in portion of a Morton Street residential yard and behind a playground on adjacent Frontenac Street. Charlotin no longer had his backpack.

Officers recovered the black backpack on the roof of the commercial building in the area where the officer previously saw it in the air and directly above where Charlotin was standing before he ran into the back door of the building to escape officers following him.

Inside the backpack, among other things,[1] officers located a loaded firearm. This firearm was a Glock Model 26, caliber 9mm Luger, semiautomatic pistol with serial number BBTP122. Contained in the firearm was a detachable magazine with nine rounds of 9mm ammunition with one of those rounds in the chamber.[2]

---

[1] Among the items in the backpack were cell phones and a black plastic bag containing a mango. Two latent prints from the plastic bag holding the mango were individualized to ANDREWS.  Video surveillance from May 1, 2019 inside the liquor store on Blue Hill Avenue showed that the liquor store had mangos for sale by the cash register. Video from earlier that day from the store also shows Andrews in the area of the counters/registers.

[2] Additional evidence demonstrating that the firearm was Charlotin's is presented in the PSR, and is not disputed by the defendant, who has pleaded guilty.  It is not repeated here.

3

**DISCUSSION**

I. <u>**Sentencing Guideline Calculation**</u>

While the U.S. Sentencing Guidelines ("USSG") are advisory and not mandatory, *United States v. Booker,* 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007).

Based on its computation of Charlotin's total offense level as 21 after a three-level reduction for prompt acceptance of responsibility, and his criminal history category as VI, Probation has calculated the GSR in this case to include a term of incarceration from 77 to 96 months, to be followed by a term of supervised release of one to three years. The government concurs with Probation's determination of the GSR, and agrees with its position with respect to the defendant's Objections.

II. <u>**Application of the Section 3553(a) Factors**</u>

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offenses and the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available, and the GSR. In this case, these factors point to a sentence of imprisonment of 77 months, and to three years of supervised release.

A.  **Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public**

In analyzing the "nature and circumstances of the offense" in this case, the Court should consider the circumstances of the defendant's arrest.  He was armed with a loaded handgun in his backpack as he walked, and then ran, through sidewalks and businesses of Boston.  One need look no further than the daily newspaper to see the danger that illegal firearms pose in the streets of Boston.  So far this year, there have been 197 shooting victims in Boston.  *See* Boston Police Crime Data, https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/5f57d4fe8bbfaa02da7d764c/1599591678186/Weekly+Crime+Overview_+9-6-20+4.pdf (last accessed Sept. 11, 2020).

A 77-month sentence of imprisonment, followed by three years of supervised release, is sufficient, but not greater than necessary, to reflect the serious circumstances of this offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant.

B.  **The History and Characteristics of the Defendant**

The government acknowledges certain points that the defense has highlighted in this case, and that are reflected in the PSR.  Charlotin reports very difficult childhood circumstances and mental health and substance abuse struggles.  Notwithstanding those challenges, he has earned a GED and his Rhode Island barber's license, and has taken an interest in and satisfaction from that work.  He has the potential to be a law-abiding member of society, after taking responsibility for his offenses, which he has begun to do by pleading guilty, and addressing his mental health and substance abuse issues, which he can begin doing in prison, including through the RDAP program, which Probation recommends and the government concurs would be beneficial to him.  *See* PSR ¶ 88.  The government's recommendation takes these attributes and this potential into account.

However, the government's recommendation must also consider other, less favorable personal characteristics. Charlotin has a length criminal record, including violent crime such as threats to shoot up a cab, PSR ¶ 37; participation in a violent larceny from a person, stealing a backpack from an individual after another man punched him in the face and stomped on his shoulder, PSR ¶ 38; and stealing money from a man at claimed gunpoint, PSR ¶ 40.

The government takes the position that the defendant misplaces too much responsibility for his criminal conduct on his mental health problems, and does not adequately recognize how his own failure to comply with mental health treatment, his substance abuse, and his personal decisions have contributed to his criminal conduct. *See* Reade Report at 7 (medical records "indicate uneven medication compliance"); PSR ¶ 86 ("The defendant advised that he [smoked marijuana blunts daily] to self-medicate as he was not taking prescribed medication for his mental health issues"); Reade Report at 15 (the defendant's condition "can usually be managed with medication"). Dr. Reade's report describes his significant substance abuse issues, Reade Report at 5-6, 11, 15-16, which are also fleshed out in the PSR. *See* PSR ¶¶ 86-88 (noting cocaine use beginning at age 15 and continuing until one month prior to his arrest, and daily marijuana use, among other substance abuse). Dr. Reade notes that medication noncompliance and substance abuse are common in people with Charlotin's illness, but complicate efforts to manage the illness. Reade Report at 16.

The government does not question Dr. Reade's credentials or efforts in this matter, but does question some of her conclusions. Her assessment of the defendant is based on 6.5 hours spent with him over the course of 6 weeks, the review of psychiatric records from a decade ago, a few short phone calls with his girlfriend and family members, and her review of a draft presentence report, and should be considered in that context. She interprets past incidents in which law

enforcement was called in response to a few incidents of bizarre behavior by Charlotin as demonstrating "that he has been repeatedly viewed as a dangerous man in need of restraint/detention rather than a mentally-ill man in need of treatment." Reade Report at 17. The Defendant in his sentencing memorandum builds on this theme, and asks that his Criminal History Category be reduced by two, and for a further downward variance, because his criminal history is attributable to mental illness and not dangerousness. However, the incidents of bizarre behavior that Dr. Reade discusses – such as those detailed in PSR ¶ 31-32 (incidents from 13 years ago) – did not result in prison time (or at least not until subsequent probation violations), and are not scored in this case. Indeed, the very lenient sentences that Charlotin has been given in his previous cases tends to indicate that the parties involve did recognize the role that mental illness may have played in those offenses, and adjusted accordingly. And there are other crimes on Charlotin's record that do not reflect bizarre behavior, but rather choices to engage in violence.

Notably, nothing in Dr. Reade's report indicates that the choices Charlotin made leading to the charges in this case were the product of mental illness. To the contrary, she reports how Charlotin recounted his lucid, if poor, decision-making: "Instead of taking myself out of the situation, I got myself a firearm." Reade Report at 11.

Altogether, the history and characteristics of the defendant do not justify a sentence outside the GSR – let alone the significant variance down to 48 months requested by the defendant. A sentence of 77 months imprisonment, with three years of supervised release, is sufficient, but not greater than necessary, to accomplish the goals of sentencing set forth in § 3553(a). Even after serving a 77-month sentence, for which he is expected to receive credit for over a year already served, Charlotin will still be a young man with a lot of potential, which the mental health and

substance abuse treatment he will receive in prison, and the structure that supervised release provides thereafter, will help him to achieve.

## **CONCLUSION**

A sentence of 77 months incarceration, along with 3 years of supervised release, is necessary in this case to reflect the seriousness of the offense of conviction, to promote respect for the law, to adequately punish Charlotin for his criminal conduct, to deter him and others from offending in the same way again, and to protect the public.

For the foregoing reasons, and those to be articulated at the sentencing hearing, the government respectfully recommends that this Court impose a sentence of 77 months imprisonment, to be followed by a three-year term of supervised release, as well as the required special assessment. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

                        Respectfully submitted,

                        UNITED STATES OF AMERICA,

                        By its attorney,

                        ANDREW E. LELLING
                        United States Attorney

                        */s/ Elianna J. Nuzum*
                        Elianna J. Nuzum
                        Assistant United States Attorney
                        John Joseph Moakley U.S. Courthouse
                        One Courthouse Way, Suite 9200
                        Boston, MA 02210
                        elianna.nuzum@usdoj.gov
                        617.748.3251

Date:  September 11, 2020

## CERTIFICATE OF SERVICE

      I, Elianna J. Nuzum, hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date:  September 11, 2020             /s/ *Elianna J. Nuzum*
                                                  Assistant United States Attorney